MARTIN FIREPROOFING PROFIT-SHARING PLAN AND TRUST, CHARLES A. MARTIN, JR., JOHN S. GAFFNEY, AND GEORGE R. BOWMAN, TRUSTEES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 37800-86.          Filed May 31, 1989.

*Donald C. Lubick, Daniel R. Sharpe,* and *Gavin L. Phillips,* for the petitioner.
*David Albert Mustone,* for the respondent.

## OPINION

WELLS, *Judge:* Respondent determined the following deficiencies and additions to tax against petitioner:

| Year | Deficiency | Sec. 6651(a)(1) [1] addition |
| --- | --- | --- |
| 1979 | $10,465.83 | $2,616.46 |
| 1980 | 21,265.76 | 5,316.44 |
| 1981 | 19,433.96 | 4,858.49 |
| 1982 | 3,841.48 | 960.37 |
| 1983 | 44,469.37 | 11,117.34 |

Respondent has conceded the additions. Thus, the instant case presents the following remaining issues: (1) Whether respondent should have permitted petitioner, a trust forming part of a profit-sharing plan, to retroactively correct violations of section 415 by reallocating excess contributions, (2) whether excess contributions made for 1976, 1977, and 1979 through 1981 should result in petitioner's disqualification in 1982 and 1983, as well as in the years the excess contributions were made, and (3) whether the statute of limitations bars assessments for 1979 and 1980.

Pursuant to Rule 122(a), the parties submitted this case to the Court without trial and on the basis of the pleadings and a stipulation of facts. The stipulation of facts and attached exhibits are hereby incorporated by reference.

### The Plan and Trust

Petitioner's legal residence [2] was in Buffalo, New York, when it filed its petition.

---

[1]Unless specified otherwise, all section references are to the Internal Revenue Code of 1954 as amended and in effect at the relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Sec. 7482(b)(1)(A) establishes venue for appeal in the case of a petitioner other than a corporation. While the parties stipulated that petitioner's principal office was in Buffalo, New York, we assume that its legal residence also was in Buffalo, New York.

Petitioner is a trust forming part of the Martin Fireproofing Profit Sharing Plan (the plan). Both petitioner and the plan utilize a calendar year accounting period. Petitioner was created by a trust agreement, effective January 1, 1960, between Martin Fireproofing Corp. (the employer) and Charles A. Martin, Jr. (Mr. Martin, Jr.), John S. Gaffney, and George R. Bowman (Mr. Bowman), who are petitioner's trustees. In a letter dated December 30, 1960, respondent determined that petitioner met the requirements of section 401(a) and was therefore exempt from taxation under section 501(a).

The plan and the trust agreement which created petitioner were "restated," effective January 1, 1976, to comply with the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 829 (ERISA). In a letter dated May 3, 1977, respondent determined that petitioner, as restated, qualified under section 401(a) and remained exempt under section 501(a).

Subsequent written amendments to the plan are dated May 11, 1977, May 7, 1979, and August 23, 1984. Additionally, on August 29, 1985, the employer and petitioner's trustees adopted a "1984 Restatement," and, on May 9, 1986, they amended the 1984 Restatement. The last two modifications were made in order to comply with the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, and the Retirement Equity Act of 1984, Pub. L. 98-397, 98 Stat. 1426. On June 9, 1986, respondent issued another favorable determination letter, applicable to plan years beginning after December 31, 1983.

At all times, the plan was a "defined contribution plan," as defined in section 414(i). Thus, the plan provided an individual account for each participant and for benefits based solely on the amount contributed to the participant's account (adjusted for any income, expenses, gains, and losses) and the portion of any forfeitures of the accounts of other participants which might be allocated to the account. Under the plan, the employer's board of directors determined the amount contributed to the plan by the employer. The plan also permitted voluntary contributions by partici-

pants, subject to the approval of the board of directors and petitioner's trustees.

For the years in issue, i.e., 1979 through 1983, the plan provided the following formula for allocating employer contributions and forfeitures:

For each Plan Year with respect to which a Company contribution is made, the Trustees shall allocate to each Qualified Participant, as hereafter defined, so much of the total contribution for such year and the amount in the forfeiture account available for redistribution at the close of such year as the compensation of such Participant bears to the total compensation of all Qualified Participants for such year.

Thus, the amounts allocated to a participant depended upon his "compensation." For the years in issue, the plan defined compensation as follows:

The term "compensation" for any Plan Year means the total amount accrued on behalf of a Qualified Participant by the Company constituting "wages" as defined in Section 3401 of the Internal Revenue Code of 1954 with respect to such Plan Year excluding overtime, bonus or similar forms of extra or exceptional compensation for such year.

For the years in issue, the plan also provided a mechanism for preventing violations of section 415, which essentially limits the amount which may be allocated to a participant for a given year. The limit is the lesser of a dollar amount or a percentage of the participant's compensation. The plan required the trustees to determine the "tentative annual addition" to each participant's account, before the employer paid its contribution for a year. If the tentative annual addition for an employee exceeded the section 415(c)(1) limit, the trustees were required to refund any employee contribution to the extent necessary. If refunding the entire amount of any employee contribution would not reduce the tentative annual addition sufficiently, then the plan required a reduction of the portion of the employer's contribution to be allocated to the employee's account.

*The Allocations*

Charles A. Martin (Mr. Martin) founded the employer and was its chief executive officer until 1968. In 1968, the employer's board of directors elected Mr. Martin chairman

of the board and a vice president. Mr. Martin's annual compensation was fixed at $30,000, and Mr. Martin has continued to work for the employer since 1968. Mr. Martin, Jr., Mr. Martin's son, has served as the employer's president since at least 1976.

Although Mr. Martin's annual compensation was fixed at $30,000 for 1968 and indefinitely thereafter, Mr. Martin waived his entire salary for each year from 1969 through 1981, except 1973. The employer did not deduct Mr. Martin's "accrued" but unpaid salary on its returns, nor did Mr. Martin report such salary on his returns.

In 1968, the employer's board of directors had approved the following resolution:

> Upon motion duly made and carried, it was resolved that as Consultant and Chairman of the Company, Chas. A. Martin participate in any profit sharing disbursement on the basis of his last annual salary.

Thus, for each year from 1969 through 1981 that the employer made a contribution to the plan, a portion of the contribution was allocated to Mr. Martin's account, regardless of whether Mr. Martin received compensation currently includable in his income. The employer made no contributions for 1969, 1971, or 1978. The employer did make contributions in 1982 and 1983, but no portions of those contributions were allocated to Mr. Martin's account.

The following table sets forth contributions made by the employer for years 1976 through 1983, the dates contributions were made, and the portions allocated to Mr. Martin's account:

| Plan year | Amount of contribution | Date made | Amount allocated to Mr. Martin's account |
|---|---|---|---|
| 1976 | $47,983.40 | 3/14/77 | $4,500 |
| 1977 | 53,021.75 | 3/14/78 | 4,500 |
| 1978 | - - - | - - - | - - - |
| 1979 | 51,244.37 | 3/10/80 | 4,500 |
| 1980 | 52,390.98 | 3/10/81 | 4,500 |
| 1981 | 58,274.32 | 3/11/82 | 4,500 |
| 1982 | 57,397.80 | 3/11/83 | - - - |
| 1983 | 57,926.70 | 3/12/84 | - - - |

No forfeitures were allocated to Mr. Martin's account for any of the foregoing years, nor did Martin ever make an

employee contribution. Mr. Martin has received no benefits under the plan.

*The Audit*

In August 1983, respondent began an audit of the plan. Respondent's audit disclosed the possibility that allocations made to Martin's account exceeded the section 415(c)(1) limit on contributions to a qualified profit-sharing plan. In the course of negotiations, petitioner and the employer proposed to reallocate amounts that had been allocated to Martin's account, but only if respondent would consider such reallocation a retroactive correction of any section 415 violations, permitting petitioner to maintain its qualified status for the years in issue. Petitioner and the employer cited section 1.415-6(b)(6)(i), Income Tax Regs., as authority for a retroactive correction. Respondent rejected the proposal, and petitioner made no reallocation.

Further negotiations resulted in the August 23, 1984, plan amendment previously mentioned. That amendment added the following language to the plan:

(d) *Section 415 Restoration Provisions.* Notwithstanding any other provision of this Plan, there shall be no allocations of company contributions, forfeitures or voluntary contributions to the account of Charles A. Martin, Sr. for any Plan Year after December 31, 1983 until such time that allocations made with respect to plan years beginning before January 1, 1984 which were in excess of the limitations of this section 4.05 minus any allocations of company contributions or forfeitures which would otherwise be made to his account for years beginning after December 31, 1983 equals zero or less.

The effective date of this Amendment is January 1, 1984. In all other respects, Martin Fireproofing Profit Sharing Plan shall remain unchanged.

The foregoing language is based upon a corrective measure described in section 1.415-6(b)(6)(ii), Income Tax Regs. Respondent has determined that petitioner regained qualified status as of the effective date of the amendment, January 1, 1984.

In a letter to respondent's National Office dated June 1, 1986, the employer requested technical advice and relief from retroactive disqualification of the plan. The employer cited section 7805(b) and section 1.415-6(b)(6), Income Tax

Regs., and argued that a retroactive correction of any excess allocations should be permitted. In the alternative, the employer requested that any adverse consequences flowing from disqualification be limited to Mr. Martin, because he was the only participant who had received "questionable allocations." The employer cited "the 'ENCEP' PROCEDURES" (REFERRING TO THE ERISA Non-Compliance Enforcement Program), as authority for such relief.

On July 30, 1986, respondent issued a "final revocation letter" which denied the requested relief and advised the employer that petitioner had lost its exempt status for the years 1976 through 1983, because of violations of section 415.[3] On the following day, respondent issued the statutory notice of deficiency in issue in the instant case.

Respondent concedes that except for the alleged violations of section 415, the plan has complied with section 401(a) during each of the years in issue.

Petitioner filed no returns for years 1979 through 1983. Respondent concedes that the failure to file was due to reasonable cause. The employer filed a duly-completed "Form 5500-C, Annual Return/Report of Employee Benefit Plan" for each of those years. The returns filed for 1979 and 1980 did not contain "Schedule P," which contains a statement by the trustee of a qualified trust. The 1979 and 1980 forms, however, were signed by Mr. Bowman when he was both an officer of the employer and one of petitioner's trustees.

*Statutory Framework*

Prior to discussing the respective arguments of the parties regarding the qualification of petitioner as exempt from taxation, a brief summary of the pertinent statutes is beneficial. Section 501(a) provides that a trust described in section 401(a) is generally exempt from taxation. Section 401(a) itemizes the requirements of a "qualified trust." Section 401(a)(16) sets forth the requirement in issue in the instant case. It states, "A trust shall not constitute a qualified trust under this section if the plan of which such

---

[3]In response to the final revocation letter, the employer petitioned this Court for declaratory relief under sec. 7476, *Martin Fireproofing Corp. v. Commissioner,* docket No. 37801-86R. The parties have stipulated that our opinion in the instant case will govern the disposition of that proceeding.

trust is a part provides for benefits or contributions which exceed the limitations of section 415."

Further, section 415(a) states that a trust forming part of a defined contribution plan will not constitute a qualified trust if "additions under the plan with respect to any participant for any taxable year exceed the limitation of subsection (c)." For the years in issue, section 415(c)(1) imposed the following limitation:

(c) LIMITATION FOR DEFINED CONTRIBUTION PLANS.—

(1) IN GENERAL.—Contributions and other additions with respect to a participant exceed the limitation of this subsection if, when expressed as an annual addition (within the meaning of paragraph (2)) to the participant's account, such annual addition is greater than the lesser of—

(A) $25,000[4] or
(B) 25 percent of the participant's compensation.

The annual addition referenced in the foregoing limitation consisted of allocations attributable to an employer's contribution and forfeitures, as well as a portion of an employee's contribution. Sec. 415(c)(2).

Respondent contends that allocations made to Martin's account for the years 1976, 1977, and 1979 through 1981 exceeded the section 415(c)(1) limit, because Mr. Martin received no compensation for those years. Respondent further argues that, because of the excess allocations, petitioner did not constitute a "qualified trust" for the years in issue, i.e., 1979 through 1983, and was not exempt from taxation for those years.

Petitioner contends that allocations to Martin's account did not violate section 415 and that, even if they did, respondent abused his discretion in not permitting petitioner to retroactively correct the violations as contemplated by section 1.415-6(b)(6), Income Tax Regs. Petitioner further argues that disqualification for 1982 and 1983 because of violations in previous years is improper and that assessments for 1979 and 1980 are barred by the statute of limitations.

---

[4]Sec. 235(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 505, substituted $30,000 as the dollar limitation. Further, the amount of the dollar limitation in effect during the years in issue varied due to cost-of-living adjustments made pursuant to sec. 415(d).

At the outset, we reject petitioner's argument that allocations to Martin's account did not exceed the section 415(c)(1) limit. We reject that argument because petitioner has conceded the issue. *Weinstein v. Commissioner*, 33 B.T.A. 105, 106-107 (1935). In its reply to respondent's answer, petitioner made the following admission:

the amounts allocated to the account of Charles A. Martin, Sr. during the plan years in issue exceeded the prescribed limitations for annual additions allowed for under Code Sections 401(a)(16) and 415(c) for plans qualified under Code Section 401(a) and * * * these excess allocations were not placed in a suspense account or reallocated to other accounts under the Plan until the 1984 plan year.

The employer made the same admission in the declaratory relief action.

Furthermore, petitioner first argued compliance with section 415 on brief, and we have repeatedly held that arguments first raised on brief will not be considered if prejudice to the opposing litigant would result. *William Bryen Co. v. Commissioner*, 89 T.C. 689, 709 (1987); *Markwardt v. Commissioner*, 64 T.C. 989, 997 (1975). Petitioner's argument that section 415 was not violated is premised upon the notion that Mr. Martin was chargeable with constructive receipt of his authorized but unpaid salary and that the salary was therefore "made available" to Mr. Martin within the meaning of section 1.415-6(a)(3), Income Tax Regs. Petitioner's argument implicates facts beyond those stipulated (cf. *Hughes v. Commissioner*, 42 T.C. 1005, 1012 (1964)), and respondent would be unfairly prejudiced by permitting the argument.

*Application of Section 1.415-6(b)(6), Income Tax Regs.*

Petitioners' next argument is that respondent abused his discretion in not permitting petitioner to correct retroactively any section 415 violations by reallocating Mr. Martin's allocations pursuant to section 1.415-6(b)(6)(i), Income Tax Regs., which states as follows:

(6) *Excess annual additions.* If as a result of the allocation of forfeitures, a reasonable error in estimating a participant's annual compensation, or under other limited facts and circumstances which the Commissioner finds justify the availability of the rules set forth in this subparagraph, the annual additions under the terms of a plan for a

particular participant would cause the limitations of section 415 applicable to that participant for the limitation year to be exceeded, the excess amounts shall not be deemed annual additions in that limitation year if they are treated in accordance with any one of the following subdivisions:

(i) The excess amounts in the participant's account must be allocated and reallocated to other participants in the plan. However, if the allocation or reallocation of the excess amounts pursuant to the provisions of the plan causes the limitations of section 415 to be exceeded with respect to each plan participant for the limitation year, then these amounts must be held unallocated in a suspense account. If a suspense account is in existence at any time during a particular limitation year, other than the limitation year described in the preceding sentence, all amounts in the suspense account must be allocated and reallocated to participants' accounts (subject to the limitations of section 415) before any employer contributions and employee contributions which would constitute annual additions may be made to the plan for that limitation year.

The foregoing regulation provides for retroactive relief in three circumstances. An excess allocation must result from either (1) forfeitures, (2) a "reasonable error in estimating" compensation, or (3) "other limited facts and circumstances" to be determined by respondent. Petitioner argues that the last two grounds support relief in the instant case. We hold that petitioner has failed to demonstrate that it is entitled to relief.

First, the excess allocations to Mr. Martin's account were not the result of "reasonable error in estimating" Mr. Martin's compensation. Petitioner's trustees were never required to estimate Mr. Martin's compensation. Mr. Martin's authorized salary had been fixed at $30,000 in 1968 for an indefinite period. Rather, the excess allocations resulted from the trustees' failure to take into account Martin's waivers of his authorized salary.

Further, such failure was not "reasonable," even if the error was one of estimation. At least two of petitioner's trustees, Mr. Bowman and Mr. Martin, Jr., were also officers of the employer and should have known, or at least have been able to ascertain, what compensation Mr. Martin actually received in a given year. Mr. Martin waived his salary for each year from 1969 through 1981, except 1973. The employer's contributions and the trustees' allocations of those contributions were made after the end of the calendar year, and, presumably, after Mr. Martin had

waived his salary. The employer's failure to deduct Mr. Martin's waived salary further evidences that the trustees should have known of the waivers. Although the plan provided a mechanism for ensuring compliance with section 415, the trustees failed to use the mechanism properly. Finally, a resolution of the employer's board of directors directed that allocations to Mr. Martin's account be based upon "his last annual salary," irrespective of his salary for the year. That resolution suggests an intentional disregard of section 415. In sum, the trustees did not act reasonably.

The other ground for relief advanced by petitioner, "other limited facts and circumstances which the Commissioner finds justify the availability of the rules set forth in this subparagraph," is a matter that petitioner concedes is within respondent's discretion. In reviewing the exercise of that discretion, we refrain from substituting our judgment for that of respondent. Rather, petitioner must demonstrate an abuse of discretion, and its burden of proof is greater than that of the usual preponderance of the evidence. *Oakton Distributors, Inc. v. Commissioner*, 73 T.C. 182, 188 (1979).

We find no abuse of discretion. As noted, petitioner's trustees did not act reasonably in allocating portions of the employer's contributions to Mr. Martin, given Mr. Martin's practice of waiving salary. On brief, petitioner argues that any violations of section 415 were "innocent and inadvertent" because "the taxpayer was unsophisticated in the technicalities of ERISA and the amounts involved were not of major size." We have recently rejected ignorance of the law as grounds for invoking the relief afforded by section 1.415-6(b)(6), Income Tax Regs. *Buzzetta Construction Corp. v. Commissioner*, 92 T.C. 641,648-649 (1989). Furthermore, we do not view the excess allocations as de minimis, even if de minimis violations are an appropriate subject for retroactive correction. The trustees violated section 415 in 1976, 1977, and 1979 through 1981. The instant case does not involve an isolated, insignificant violation.

Petitioner points out that respondent accepted an amendment to the plan conforming to section 1.415-6(b)(6)(ii), Income Tax Regs., which provides for reducing or eliminating future allocations to a participant's account until excess

allocations have been corrected. We do not view respondent's acceptance of the amendment, however, as a concession that retroactive relief is warranted. Rather, respondent's acceptance of the amendment and petitioner's requalification, effective January 1, 1984, are consistent with our opinion, *infra*, that corrective action of the sort set forth in the regulations is a prerequisite to requalification of a trust, following a violation of section 415.

### Disqualification for 1982 and 1983

Petitioner next argues that disqualification should be limited to 1979, 1980, and 1981, the years for which excess allocations were made to Mr. Martin's account. Petitioner argues that disqualification for 1982 and 1983 is improper, because no excess allocations were made to Mr. Martin's account for those years.

Respondent argues that Congress' purpose in enacting section 415 would be frustrated by limiting disqualification to the years excess allocations are made. Respondent argues that after a plan violates section 415, disqualification continues until the violation is corrected.

We agree with respondent. Petitioner's interpretation of section 415 invites abuse of the qualified plan rules. For example, in Year 1, an employer could contribute a substantial portion of its earnings to its profit-sharing plan, intentionally violating section 415, without also violating the exclusive benefit or nondiscrimination rules. Although the contribution would disqualify the plan in Year 1, in Year 2 and subsequent years, the large amount contributed would earn tax-deferred income in an exempt trust. We do not believe that Congress intended to sanction such a result.

Moreover, the language of section 415 supports respondent's interpretation. Section 415(a)(1) states, in pertinent part:

(a) GENERAL RULE.—
(1) TRUSTS.—A trust which is part of a pension, profit-sharing, or stock bonus plan shall not constitute a qualified trust under section 401(a) if—

\* \* \* \* \* \* \*

(B) in the case of a defined contribution plan, contributions and other additions under the plan with respect to any participant *for any taxable year* exceed the limitation of subsection (c) * * * [Emphasis supplied.]

The statute's express reference to "any taxable year" suggests that we look at allocations made in prior years to determine a plan's status in a given year. If the phrase "for any taxable year" followed "shall not constitute a qualified trust under section 401(a)," then the statutory language might support petitioner's interpretation. The authors of the statute, however, did not use the phrase to limit the period of disqualification.

Assuming, however, that section 415 is silent as to whether disqualification should continue beyond the year in which an excess allocation is made, we look to the legislative history to ascertain the statute's purpose and construe the statute in a manner which will further that purpose. *United States v. American Trucking Association, Inc.,* 310 U.S. 534, 542-545 (1940) ("In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress.").

The legislative history of ERISA sets forth one of Congress' purposes in enacting section 415. The House Report stated:

Your committee recognizes the importance of tax incentives in creating a strong private pension system. At the same time, however, your committee believes it is appropriate to provide some limitations *to prevent the accumulation of corporate pensions out of tax-sheltered dollars* which are swollen completely out of proportion to the reasonable needs of individuals for a dignified level of retirement income. * * * [H. Rept. 93-807, 1974-3 C.B. (Supp.) 236, 347. Emphasis supplied.]

Thus, Congress sought to limit the "accumulation of corporate pensions out of tax-sheltered dollars." Limiting plan disqualification to the years excess allocations are made would run afoul of and defeat that purpose, as excess allocations would be permitted to earn tax-deferred income in an exempt trust. Consistent with and in furtherance of Congress' stated intent, we read section 415 to require disqualification until the section 415 violation is corrected,

e.g., by reallocating the excess allocation or by placing it in a suspense account.

As further evidence that Congress sought to limit the extent to which funds contributed to a plan could earn tax-deferred income in an exempt trust, we note section 415(c)(2). For the years in issue, that section required that a portion of an employee contribution be taken into account in determining whether the annual addition for a year exceeded the section 415(c)(1) limit. Because employee contributions to a plan are made in after-tax dollars, the only tax benefit gained from such contributions is deferral of the income to be earned on the amounts contributed. Yet, Congress expressly limited that benefit.[5] If Congress were unconcerned with the tax-deferred accumulation of income in exempt trusts, as suggested by petitioner's interpretation of section 415, it would not have limited employee contributions. Yet, the legislative scheme seeks to limit the accrual of income on a tax-deferred basis, and we should not interpret section 415(a) in a manner which will place it at cross-purposes with section 415(c)(2). *Crane v. Commissioner,* 331 U.S. 1, 13 (1947) ("one section of the Act must be construed so as not to defeat the intention of another or to frustrate the Act as a whole.") [6]

Finally, we have held that a plan's violation of section 401(a)(4)'s nondiscrimination rule can result in the plan's disqualification for subsequent years. In *Boggs v. Commissioner,* 83 T.C. 132, 144 (1984), revd. on another issue 784 F.2d 1166 (4th Cir. 1986), we stated, "We can discern no reason why we should not examine the operation of the trust in prior tax years to determine whether or not

---

[5]Congress required that only a portion of an employee contribution be considered, because employee contributions do not receive the other tax benefit that accompanies contributions to qualified plans, i.e., the deferral of compensation. H. Rept. 93-807, 1974-3 C.B. (Supp.) at 356 ("the employee receives one of the two tax advantages generally associated with contributions to a qualified plan—deferral of the taxes on the earnings on the contributions—but does not receive a tax deduction for the amount of the contribution when it is made."). Incidentally, for years beginning after 1986, the *entire* employee contribution is considered in determining whether the sec. 415(c)(1) limit is exceeded. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1106(e), 100 Stat. 2085, 2424.

[6]Although sec. 415(g) authorizes respondent to disqualify one or more *aggregated* plans "until such benefits or contributions do not exceed the limitations contained in this section," that section does not apply when the *single* plan of a single employer violates sec. 415. In any event, the subsection's use of the word "until" suggests, if anything, that remedial measures must be taken before the offending plan(s) can requalify. Thus, we read that provision as consistent with the legislative scheme.

respondent properly revoked the trust's qualified status." Absent express direction from Congress, we can discern no reason why enforcement of section 401(a)(16) should differ from enforcement of section 401(a)(4). Thus, petitioner's "now you're disqualified, now you're not" approach has no support in the Code or legislative history and is inconsistent with our interpretation of another qualified trust requirement.

Although petitioner cites the regulations in support of its interpretation (see sec. 1.415-9(a), (b)(2), (b)(3), Income Tax Regs.), the regulations do not definitively resolve the issue. To say that a plan is disqualified "with respect to a particular limitation year" or "in that limitation year" does not necessarily suggest that the plan automatically requalifies in future years. Rather, the regulations can be read as requiring that disqualification *commence* in the year of the violation.

Section 1.415-9(b)(1), Income Tax Regs., illustrates the ambiguity of the regulations. It provides that a trust "shall be disqualified *as of* the first day of the first plan year containing any portion of the particular limitation year [in which an excess allocation is made]." (Emphasis supplied.) Thus, the regulations provide a *starting date* for disqualification, but are silent as to when disqualification *terminates*. A fair, if not strong, inference can be drawn that disqualification is indefinite. If the regulations had meant to provide that a plan would be disqualified *for* a given plan year (rather than "as of" a given date), they could have so stated.

Moreover, petitioner's interpretation of the regulations becomes unworkable when a limitation year falls within two plan years, a contingency contemplated by section 1.415-9(b)(1), Income Tax Regs. Under such circumstances, would disqualification be limited to the first plan year? If so, then is the plan really disqualified "with respect to a particular limitation year," as petitioner would construe that phrase? On the other hand, if disqualification would persist for two plan years, the duration of disqualification would depend upon whether the plan and limitation years are concurrent, a seemingly arbitrary result. In sum, we do not view the regulations as dispositive of the issue before us. In any

event, the statutory language and Congressional intent must take precedence over the regulations in our analysis of the statute. *Iglesias v. United States,* 848 F.2d 362, 366-367 (2d Cir. 1988).

Petitioner cites Revenue Ruling 72-368, 1972-2 C.B. 220, which stated that a plan which failed to qualify under section 401(a) in its first year could, nevertheless, qualify in a subsequent year, even if contributions made during nonqualified years remained in the plan. The ruling does not support petitioner's interpretation of section 415. First, the ruling predates section 415, which was enacted in 1974, as part of ERISA. Second, the ruling does not *require* respondent to qualify a plan in the absence of corrective action. Revenue Ruling 73-79, 1973-1 C.B. 194, made this clear. There, respondent stated that a plan violating the coverage requirements of section 401(a)(3) could requalify in a subsequent year, but only after amendment of the plan and a reallocation of contributions made for the years of violation.

Our holding does not require permanent disqualification of a plan which has violated section 415. Rather, we construe section 415 to require disqualification until remedial action is taken. For that period of time, section 415 is violated because contributions "for any taxable year" exceed the statutory limit. For that period of time, a trust does not satisfy section 401(a)(16) because it is part of a plan which sanctions and thus "provides for benefits or contributions which exceed the limitations of section 415."[7] Further, the policy considerations underlying section 415 require disqualification until correction, because disqualification solely for the year of the excess allocation does not affect the ability of the plan to shelter income earned on the excess allocation, an express concern of Congress. Requiring reallocation or other corrective action, on the other hand, fully effectuates Congress' intent to limit the treasury's subsidy of employee benefits.

---

[7]The requirements of sec. 401 may be violated by the *operation* of a plan as well as its provisions. Sec. 401(a)(4) makes this evident, as it is hard to imagine a plan which, on its face, discriminates in favor of "highly compensated employees." Most violations of sec. 401(a)(4), it would seem, are operational. E.g., *Greenwald v. Commissioner,* 366 F.2d 538, 540 (2d Cir. 1966) ("the fact that the trust once qualified does not mean that it could not lose its qualification by becoming discriminatory in operation."); *Boggs v. Commissioner,* 83 T.C. 132, 143 (1984), revd. on another issue 784 F.2d 1166 (4th Cir. 1986).

Also, in certain cases it may be too harsh a sanction to disqualify a plan until an excess allocation is corrected. For example, a multimillion dollar plan covering the employees of a large corporation may make some nominal excess allocation that remains undiscovered for a period of years. In such a case, however, it may well constitute an abuse of discretion for respondent to deny the relief afforded by section 1.415-6(b)(6), Income Tax Regs., if the employer takes remedial measures upon discovering the error. As noted, the facts of the instant case do not warrant such relief.

In sum, we construe section 415 to require petitioner's disqualification until 1984, when the employer amended the plan to correct the excess allocations to Martin's account. We believe that such an interpretation of the statute best serves Congress' purpose and preserves the integrity of the rules.

*Periods of Limitation*

Finally, petitioner argues that assessments for 1979 and 1980 are barred by the periods of limitation on assessments and collection under section 6501(a). That section provides the general rule that requires assessment within 3 years of the date a return is filed. Petitioner concedes that it filed no returns for 1979 and 1980 but cites a number of statutory and administrative provisions in support of its position that the periods of limitation nonetheless have expired for those 2 years.

Petitioner argues that section 6501(g)(2) provides authority for treating the Form 5500-C, Annual Return/Report of Employee Benefit plan, as its return, thus starting the running of the applicable periods of limitation. Section 6501(g)(2) states as follows:

(2) EXEMPT ORGANIZATIONS.—If a taxpayer determines in good faith that it is an exempt organization and files a return as such under section 6033, and if such taxpayer is thereafter held to be a taxable organization for the taxable year for which the return is filed, such return shall be deemed the return of the organization for purposes of this section.

Under the foregoing provision, if petitioner made a good-faith determination that it was exempt from taxation for 1979 and 1980, then the filing of information returns under

section 6033 for those years would have started the running of the applicable periods of limitation. Respondent concedes that petitioner determined its tax-exempt status in good faith. Respondent argues, however, that petitioner did not file returns under section 6033 for 1979 and 1980, and that therefore section 6501(g)(2) affords no relief.

Petitioner contends that information returns filed by the employer for 1979 and 1980 satisfied petitioner's section 6033 filing requirement. As authority for its position, petitioner cites the following portion of section 6033(a)(1), which generally requires that exempt organizations file information returns:

in the discretion of the Secretary any organization described in section 401(a) may be relieved from stating in its return any information which is reported in returns filed by the employer which established such organization.

Pursuant to the foregoing grant of authority, respondent relaxed considerably the filing requirements of qualified trusts. For example, Announcement 75-136, 1975-51 I.R.B. 18, declared that for tax years after 1975, qualified trusts no longer would be required to file Form 990-P, given an employer's separate obligation to file information returns under section 6058. Thus, at one time, respondent permitted qualified trusts to meet the section 6033 filing requirement without filing any return at all.

Subsequently, respondent issued Announcement 80-45, 1980-15 I.R.B. 17, which states that an "optional trust statement" must be attached to an employer's section 6058 information return in order to activate the statute of limitations. The announcement reads as follows:

To commence the running of the statute of limitations for any trust described in section 401(a) of the Internal Revenue Code and exempt from tax under section 501(a), or for any custodial account described in section 401(f), the trustee or custodian may file the trust statement for years ending with or within plan years that begin January 1, 1979, or later. This statement will be treated as a return of the trust for the period for which it is filed.

\*       \*       \*       \*       \*       \*       \*

For 1979 and later years the statutory period during which the Service may assess taxes under section 6501(a) of the Code (other than taxes for unrelated business income) against a trust which was believed to be tax

exempt but later was determined not to be so exempt, expires three years after the later of: 1) the date an employer or administrator files its Form 5500 series return, with the trust statement attached; or 2) the last day allowed by law or regulation for filing the returns (with the trust statement attached). If the trust statement is not filed, the statute of limitations will not begin to run for the trust.

The instructions to an employer's information returns for 1979 and 1980 also advised that the optional trust statement had to accompany the returns in order to commence the statute of limitations. The instructions to Form 5500-C set forth the following form for the required statement:

This statement constitutes the annual information return required under section 6033(a) of the Internal Revenue Code of 1954 filed for the trust year ending (date) _____ .

Under penalties of perjury, I declare that I am the (trustee) (custodian) of the _____ , which serves as a part of _____ .
     (Name of trust)                           (Name of plan)

Date _____ Signature of Fiduciary _____

Thus, if the employer had attached the optional trust statement to its information returns for 1979 and 1980, petitioner would have met the section 6033 filing requirement for those years, and, because of section 6501(g)(2), the statute of limitations would bar assessments for those years. Petitioner concedes that the employer failed to attach the optional trust statements. Nonetheless, petitioner asserts that there has been sufficient compliance with respondent's requirements. We agree with respect to 1980 but not as to 1979.

Respondent has the authority to specify the forms and other requirements of returns. Secs. 6011(a), 6033. In *Commissioner v. Lane-Wells Co.,* 321 U.S. 219, 223 (1944), the Supreme Court explained the reason for giving respondent such authority as follows:

The purpose is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished.

On the other hand, letter-perfect compliance with respondent's requirements is not always required. Thus, in

*Zellerbach Paper Co. v. Helvering,* 293 U.S. 172, 180 (1934), the Supreme Court stated the following:

Perfect accuracy or completeness is not necessary to rescue a return from nullity, if it purports to be a return, is sworn to as such * * * and evinces an honest and genuine endeavor to satisfy the law. This is so though at the time of filing the omissions or inaccuracies are such as to make amendment necessary.

See also *Beard v. Commissioner,* 82 T.C. 766 (1984), affd. per curiam 793 F.2d 139 (6th Cir. 1986); *W.K. Buckley, Inc. v. Commissioner,* 158 F.2d 158, 161 (2d Cir. 1946).

In *Beard v. Commissioner, supra* at 777, we noted that the Supreme Court has set forth four requirements that a document must meet in order to constitute a return for statute of limitations purposes. We also held that the same four requirements must be met before a return will be considered filed for section 6651(a)(1) (late-filing addition) purposes. *Beard v. Commissioner, supra* at 777, requires (1) that sufficient data be supplied to calculate tax liability, (2) that a document purport to be a return, (3) that there be an "honest and reasonable attempt to satisfy the requirements of the tax law," and (4) that a return be executed under penalty of perjury. We consider those four criteria relevant to our inquiry in the instant case, i.e., whether petitioner filed returns satisfying section 6033 for 1979 and 1980.

In the optional trust statement, the trustee must declare, under penalty of perjury, that he is the trustee of an identified trust which forms part of an identified plan. The 1980 Form 5500-C filed by the employer contained, in essence, the required statement, albeit not in the form prescribed by respondent. On line 23, the employer listed petitioner's trustees, and on line 5, the related plan was named. Furthermore, the return was signed, under penalty of perjury, by one of the named trustees, Mr. Bowman, albeit in his capacity as secretary of the employer. Mr. Bowman's failure to sign in his capacity as trustee does not prevent petitioner from complying with the section 6033 filing requirement. Cf. *Consolidated Apparel Co. v. Commissioner,* 17 T.C. 1570, 1583 (1952), affd. in part and revd. in part on another issue 207 F.2d 580 (7th Cir. 1953) (return substantially complied with statutory requirement that it be signed by a "principal officer" and a financial officer;

although president of corporation, who signed return, failed to sign return again in his capacity as treasurer.

We hold that the 1980 Form 5500-C satisfied the requirements of *Beard v. Commissioner, supra.* The form contained sufficient data to calculate petitioner's liability; it constituted an "honest and reasonable" effort to comply with the law; and it was signed, under penalty of perjury, by one of petitioner's trustees. Although the form does not purport to be *petitioner's* return, respondent has not required qualified trusts to file returns on their own behalf since 1976. Thus, that requirement is not applicable in the context of the instant case. Petitioner satisfied the section 6033 filing requirement for 1980. Therefore, the period of limitation bars assessment for that year.

The employer's information return for 1979, however, failed to disclose the identity of petitioner's trustees. We will not second-guess respondent's need for this information. *Commissioner v. Lane-Wells Co., supra* at 223. There may be a number of reasons why respondent would want some party to declare, under penalty of perjury, that he, she, or it administers a qualified trust. Because the 1979 Form 5500-C filed by the employer did not provide such a statement, we hold that the section 6033 filing requirement was not met for 1979 and that therefore the period of limitation does not bar assessment for that year.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

NIMS, PARKER, HAMBLEN, COHEN, JACOBS, GERBER, PARR, and COLVIN, *JJ.,* agree with this majority opinion.

RUWE, *J.,* did not participate in the consideration of this opinion.

---

WHALEN, *J.,* dissenting: I agree with the majority that respondent did not abuse his discretion under section 1.415-6(b)(6)(i), Income Tax Regs. I also agree that the period of limitations on assessment under section 6501(a) bars assessment of a tax deficiency for the year 1980 but

not the year 1979. I disagree, however, with the majority's holding that petitioner is disqualified under section 401(a) for the years 1982 and 1983 solely because annual additions exceeding the limitation of section 415(c) were made to a participant's account for the years 1979, 1980, and 1981. Unlike the majority, I submit that section 415 is intended by Congress to apply automatically on a year-by-year basis and to cause disqualification of a trust only in the "year" for which an excess contribution is made.

*The Statutory Scheme*

Section 415 imposes an annual limitation on contributions and other additions to the account of each participant in a defined contribution plan. The limitation is formulated in terms of the "annual addition" to a participant's account, defined to mean "the sum for any year of—(A) employer contributions, (B) the employee contributions, and (C) forfeitures." Sec. 415(c)(2). Under section 415(c), the annual addition to a participant's account in a defined contribution plan cannot exceed the lesser of a specified dollar amount or 25 percent of the participant's compensation. This limitation applies on an overall basis to all contributions and other additions for a particular employer under all of the plans and accounts in which the employee is a participant. See secs. 415(f) and 415(g).

It is clear that the annual limitation set out in section 415(c) is intended to be applied on a year-by-year basis.[1] It contains no mechanism to take into account employer contributions, employee contributions, or forfeitures made for a year other than the "year" for which the limitation is computed. This is confirmed by the detailed legislative regulations promulgated thereunder. Sec. 1.415-6, Income Tax Regs.

---

[1]Congress recognized the importance which the definition of the term "year" would play in applying the sec. 415 limitation on an overall basis, not only in the context of employers with a single plan, but also in the context of employers with more than one plan. E.g., H. Rept. 93-779 (1974), 1974-3 C.B. 244, 362 n. 9. Accordingly, Congress specifically directed the Secretary of the Treasury to "prescribe such regulations as may be necessary to carry out the purposes of this section, including, but not limited to, regulations defining the term 'year' for purposes of any provision of this section." Sec. 415(j). The regulations promulgated thereunder define the term "limitation year" and make it clear that the annual limitation contained in sec. 415(c) is to be applied on a year-by-year basis. Sec. 1.415-1(b) and sec. 1.415-6, Income Tax Regs.

The statutory scheme for application of such limitation is also clear. On one hand, section 401(a)(16) denies qualification to a trust forming part of a defined contribution plan if the written terms of the plan "provide for" contributions in excess of such limits. Any defect in form requires disqualification of the trust for so long as the defect remains in the plan and regardless of whether any excess contributions are actually made under its terms. No defect in form is involved in this case, and so the majority errs when it states that "section 401(a)(16) sets forth the requirement in issue in the instant case." (Majority opinion at p. 1179.) See also the majority's reference to "enforcement of section 401(a)(16)." (Majority opinion at p. 1187.)

On the other hand, it is section 415(a)(1)(B) which disqualifies the trust if the section 415(c) limitation is exceeded by the contributions actually made in operation of the plan. It is this limitation on the operation of the plan— and the sanction provided by section 415(a)(1)(B)—which is in issue.

In this case, annual additions consisting of employer contributions were made to the account of one participant, Mr. Martin, for each year 1979, 1980, and 1981. Each annual addition exceeded the applicable limitation under section 415(c) and, therefore, petitioner does not constitute a qualified trust or an organization exempt from tax for each such year. Sec. 415(a)(1)(B) and sec. 501(a).

For the years 1982 and 1983, no employer contribution was allocated to Mr. Martin's account nor was any other addition made to his account. There was, accordingly, no "annual addition," as that term is defined by section 415(c)(2), to Mr. Martin's account for either year and, by definition, there could be no annual addition for either year in excess of the limitation of section 415(c). There is, accordingly, no basis for finding that in either 1982 or 1983 petitioner did "not constitute a qualified trust under section 401(a)" pursuant to the provisions of section 415(a)(1)(B). Because respondent based his determination in this case exclusively on the application of section 415, I would hold that his determination is incorrect with respect to both 1982 and 1983.

Unlike the majority, I believe that the Congressional intent "to prevent the accumulation of corporate pensions out of tax-sheltered dollars" is enforced under section 415 by disqualification of the plan for the year in which an operational violation takes place. Disqualification not only has the effect of subjecting the trust to tax, such as determined by respondent in this case, but it can also cause all plan participants to be subject to current tax on the employer's contribution, see section 1.402(b)-1, Income Tax Regs., or cause the employer to lose its deduction with respect to contributions to the plan, see section 1.404(a)-12, Income Tax Regs. Indeed, loss of qualification for the year is no less severe because the excess addition is made to the account of only one participant, as in this case. All participants are subject to current taxation with respect to their accounts, not just the participant into whose account the excess additions were made, and the employer loses a current deduction for the full contribution, not just the excess portion allocated to one account.

I find nothing in the language of section 415 or its legislative history to suggest that disqualification of the plan due to an operational violation in one "year" was intended to cause disqualification for any other "year." To the contrary, section 415 is an annual test applied on a year-by-year basis, and there is nothing in section 415 to cause the test results from one year to be taken into account for any other year.

*Treasury Regulations Promulgated Under Section 415*

Treasury regulations confirm that disqualification is required only in the "year" for which the limitations of section 415 are exceeded. Pursuant to the specific rule-making authority contained in section 415(j), the regulations define the concept "limitation year," section 1.415-2(b), Income Tax Regs., and require that the "annual additions" made to each participant's account be tested on an overall basis for each limitation year against the section 415 limits. Sec. 1.415-6, Income Tax Regs.

The regulations provide, in the case of a single defined contribution plan, that, if excess annual additions are made to the account of any participant "for any particular

limitation year," the plan is "disqualified in that limitation year." Section 1.415-9(b)(2), Income Tax Regs., states as follows:

if the employer only maintains a single defined contribution plan under which annual additions (as defined in section 1.415-6(b)) allocated to the account of any participant exceed the limitations of section 415(c) and section 1.415-6 *for* any particular limitation year, such plan is also disqualified *in* that limitation year. [Emphasis supplied.]

The regulations thus conform to the statute and require disqualification of the plan in the "limitation year" in which an operational violation of section 415 takes place. They do not address the effect of disqualification for a particular limitation year on any other limitation year because other limitation years are tested independently under section 415 based upon the "annual additions" made with respect to each such year. This is further confirmed by section 1.415-9(a)(1), Income Tax Regs., which provides that a defined contribution plan is disqualified "with respect to a particular limitation year" if the following "condition" exists:

Annual additions (as defined in section 1.415-6(b)) with respect to the account of any participant in a qualified defined contribution plan maintained by the employer exceed the limitations of section 415(c) and section 1.415-6.

Significantly, the above regulation does not provide that the existence of excess annual additions from a prior limitation year is a "condition" requiring disqualification.

The majority's analysis of the regulations focuses on section 1.415-9(b)(1), Income Tax Regs., which deals with the possibility that a plan may have a "plan year" which is different from the "limitation year" defined by the regulations. In that case, the regulations remove any uncertainty about the scope of disqualification by providing that the plan is "disqualified as of the first day of the first plan year containing any portion of the particular limitation year.' Sec. 1.415-9(b)(1), Income Tax Regs. Disqualification of the plan "as of" the beginning of the first "plan year" does not reasonably imply, as the majority concludes, that the regulations require "indefinite" disqualification if an excess annual addition is made for a particular "limitation year."

The purpose of that regulation is to make it clear that disqualification for a particular limitation year will implicate whatever plan years are involved, "as of the first day of the first plan year." The rule is essential in those cases where the limitation year differs from the plan year, and it is specifically contemplated by the grant of authority to the Secretary of the Treasury in section 415(j) to define the term "year." Unlike the majority, I find nothing "unworkable" or "arbitrary" about this rule. (Majority opinion at 1188.) In any event, it is undeniable that the regulations limit disqualification for a section 415 violation to "a particular limitation year." Accordingly, where the limitation year is coincident with the plan year, as in this case, disqualification is limited to the "year" in which section 415 is violated.

The majority's treatment of the regulation, on the other hand, is both inconsistent and confusing. At first, it finds "a fair, if not strong, inference" that the regulation requires "indefinite" disqualification of a plan following a section 415 violation, based upon the words "as of" contained in section 1.415-9(b)(1), Income Tax Regs., as discussed above. (Majority opinion at 1187.) That position, however, leads to the clearly erroneous conclusion that the plan must be permanently disqualified. Apparently, the inference of indefinite disqualification is not sufficiently strong to even take into account, because the majority later concludes that the regulations are either not "dispositive" or "do not address" the issue before the Court. (Majority opinion at 1187-1188.) Finally, the majority compounds the confusion by citing *Iglesias v. United States,* 848 F.2d 362 (2d Cir. 1988), a case in which regulations were invalidated as contrary to the statute and Congressional intent. (Majority opinion at 1187-1188.) In the final analysis, the reader can tell that the majority has brushed the regulations aside, but cannot tell precisely why.

## The Majority's Version of Section 415

It is noteworthy that the majority does not contend that an annual addition in excess of the limitation of section 415(c) was made for either 1982 or 1983. Rather, the majority bases its position that petitioner is disqualified for

1982 and 1983 entirely on an erroneous reading of section 415(a)(1)(B). That provision states that a trust forming part of a defined contribution plan "shall not constitute a qualified trust under section 401(a) if— * * * contributions and other additions under the plan with respect to any participant for *any taxable year* exceed the limitation of subsection (c)." Sec. 415(a)(1)(B). (Emphasis supplied.)

The majority seizes upon and misreads the phrase "any taxable year" to justify its position that petitioner is disqualified under section 415(a) for 1982 and 1983 based upon the excess annual additions made in prior years. The majority says that this phrase "suggests that we look at allocations made in prior years to determine a plan's status in a given year." (Majority opinion at 1185.) Under this view, use of the phrase "any taxable year," rather than a phrase such as "the taxable year," means that Congress intended to require disqualification for the current year if the subsection (c) limitation has been exceeded for "any taxable year," even if the annual addition for the current year does not exceed the limitation of subsection (c).

The majority's reading of section 415(a)(1)(B) is plainly wrong. It fails to recognize that this operational provision was written to apply the section 415(c) limitation on an overall basis to all defined contribution plans maintained by the same employer. The subject phrase refers to "contributions and other additions" which are made under the plan "with respect to any participant for any taxable year." In this case, the employer maintained only one defined contribution plan which used the calendar year as its plan year. Therefore, each contribution or other addition made by the employer can relate to only one "taxable year" for purposes of section 415(a)(1)(B). However, an employer can maintain several plans with different years. See, e.g., sec. 1.415-2(b), Income Tax Regs. For purposes of applying section 415 in situations involving more than one defined contribution plan, all of the employer's plans are aggregated and treated as one plan. Sec. 415(f)(1)(B). The phrase "any taxable year" is used in section 415(a)(1)(B) because the contributions and other additions for more than one taxable year can be impli-

cated by an excess annual addition under section 415(c).[2]

After misconstruing the phrase "any taxable year," the majority reasons that a defined contribution plan must be disqualified in later years if there has been a violation of section 415(c) in "prior years." However, the phrase on which the majority relies, "any taxable year," is not limited to only "prior years" in which excess annual additions are made. Under the majority's reasoning, therefore, once a violation of section 415(c) occurs, disqualification under section 415(a)(1)(B) logically extends not only to later years, as the majority suggests, but also to "earlier years" preceding the year in which the first offending annual addition is made. If the majority is correct, a violation of the section 415 limitations for "any taxable year" logically causes a defined contribution plan and its related trust to be disqualified for *all* years. Such sweeping disqualification was clearly not intended by Congress but would be required under the majority's opinion.

Furthermore, under the majority's interpretation of section 415, once a violation takes place, the pension plan and its related trust are disqualified for other years "until the section 415 violation is corrected." However, unlike other provisions of the Code in which Congress has specifically

---

[2]This problem of applying sec. 415(c) on an overall basis to more than one defined contribution plan maintained by a single employer is summarized in the following section of Rev. Rul. 79-5, 1979-1 C.B. 165, which is one of the published rulings constituting guidelines issued by respondent prior to promulgation of the regulations later issued pursuant to sec. 415(j):

SEC. 4. LIMITATIONS FOR DEFINED CONTRIBUTION PLANS.

.01 Section 415(f)(1)(B) of the Code requires that all defined contribution plans (whether or not terminated) of an employer shall be treated as one defined contribution plan. This Section 4 provides guidelines for aggregating defined contribution plans with differing limitation years.

.02 If a participant is credited with annual additions or employee contributions in only one plan, in determining whether the requirements of section 415(c) are satisfied, only the limitation year applicable to that plan is considered. However, if a participant is credited with annual additions or employee contribution in more than one plan, each plan limitation year with respect to the participant which receives an addition or employee contribution must be considered in determining whether the requirements of section 415(c) are satisfied. Thus, the limitations for defined contribution plans described in Section 4 of Rev. Rul. 75-481 must be satisfied for a participant with respect to the limitation year of a plan if and only if such participant is deemed credited with an annual addition or an employee contribution with respect to that plan as of any date within that limitation year.

.03 For purposes of determining whether the requirements of Section 4 of Rev. Rul. 75-481 are satisfied with respect to any limitation year described in subsection .02, the annual additions taken into account shall be all annual additions allocated to an account of the participant under any plan (regardless of the limitation year of such plan) as of any date within such limitation year.

prescribed corrective measures, e.g., section 4975, section 415 provides no remedial or corrective mechanism to erase the taint from an excess annual addition made for a particular taxable year. Accordingly, there is nothing in the statute to differentiate between an uncorrected year, which is to be included under the phrase "any taxable year" in section 415(a)(1)(B), and a corrected year, which is not so included. Therefore, under the majority's interpretation, the statute, as written, results in permanent disqualification of a plan for any violation of section 415.

The majority denies that its position requires permanent disqualification for violation of section 415 and states that it "construe[s] section 415 to require disqualification until remedial action is taken." (Majority opinion at 1188.) The majority points to nothing in the statute on which it bases this "construction," and its vague reference to "remedial action" fails to explain what type of action is required to end disqualification. What is clear, however, is that the remedial action approved by the Court in this case allows the excess contributions to remain in Mr. Martin's account and, thus, would not cure the abuse perceived by the majority as justification for the continuing disqualification requirement in the first place.

Moreover, "remedial action" cannot be taken until an operational violation of section 415 is discovered. Thus, if an operational violation of section 415 is not discovered until after the passage of a number of years, the majority's disqualification-until-correction rule will have an effect similar to permanent disqualification of the plan. This is particularly troublesome in view of the fact that neither ignorance of the law, nor, I suspect, inadvertence, constitutes grounds for the relief afforded by section 1.415-6(b)(6), Income Tax Regs. *Buzzetta Construction Corp. v. Commissioner*, 92 T.C. 641, 648-649 (1989).

*The Hypothetical "Abuse" Perceived by the Majority and Congressional Intent*

To justify its position, the majority hypothesizes that employers may intentionally violate the section 415 limitations by contributing a substantial portion of their earnings to a profit-sharing plan for the purpose of earning tax-deferred income in an exempt trust. Even though the facts

of this case differ from those of the hypothetical, the majority reasons that petitioner must be disqualified under section 415 for 1982 and 1983 because the abuse which it perceives to be implicit in the hypothetical cannot be permitted.[3] In effect, the majority decides this case based upon facts not before the Court. Moreover, this hypothetical abuse was not raised by respondent as grounds for his position and we do not have the benefit of the analysis of either party concerning the application of either section 415 or any other provision of the Code to such facts.

I agree with the majority that Congress was concerned with limiting the tax-deferred accumulation of income in exempt trusts. As the majority points out, this concern is demonstrated by section 415(c)(2) itself, which also limits the amount of nondeductible *employee* contributions. Nevertheless, the majority's reasoning is flawed because it assumes that Congress must have intended continuing disqualification of every plan to be the only method to prevent the unwarranted tax deferral suggested by the hypothetical.

First, section 415 does not support the majority's view that Congress intended broad use of disqualification to prevent unwarranted tax deferrals. Section 415(c)(2), the provision from which the majority extrapolates a Congressional intent for continuing disqualification, takes into account contributions and additions only on a year-by-year basis. In determining the qualified status of a plan for a particular year, section 415(c)(2) does not take into account earnings on excess contributions or anything else which might imply continuing taint of the plan. I submit that there is nothing in section 415 to suggest that disqualification in the year of the violation does not accomplish the intent of Congress or that Congress intended continuing disqualification.

Second, in considering section 415, Congress was well aware of the problem of unwarranted tax deferrals on excess contributions and specifically addressed this problem in the context of so-called H.R. 10 plans and individual

---

[3]Most plans, and perhaps the overwhelming majority of plans, including the subject plan, could not be operated in this "abusive" manner without violating the exclusive benefit and nondiscrimination rules. See sec. 1.401-1(a)(3), Income Tax Regs., and sec. 401(a)(4).

retirement accounts through sections 2001(f) and 2002(d) of ERISA. The legislative history indicates that this problem did not escape the notice of Congress:

under the bill a nondeductible excise tax is to be imposed on contributions to individual retirement accounts and annuities in excess of the amounts deductible as retirement savings, unless these amounts (with earnings) are timely distributed from the account. This tax is to prevent the unwarranted tax deferral that would exist from income on excess contributions, and is to be 6 percent of the amount of the excess contributions. The excise tax is to be paid by the individual who made the excess contributions.

If an excess amount is contributed to an individual retirement account (or annuity) in one year and the excess is not eliminated in later years, the excise tax is to be owed on the excess amount for the year of contribution and for each successive year until the excess is eliminated. (The amount of the excess is to be determined as of the end of the individual's taxable year.) However, an individual may eliminate an excess contribution in later years if he does not take his maximum allowable deduction for retirement savings in the later years. Under the bill, if an individual takes less than the maximum amount allowed as a retirement savings deduction in any year after the excess contribution is made, the difference between the maximum allowed deduction and the amount taken is to reduce a prior excess contribution. [H. Rept. 93-779 (1974), 1974-3 C.B. 244, 272. Fn. ref. omitted.]

Accordingly, sections 4972 and 4973, as enacted by ERISA, expressly provided that excess contributions to an H.R. 10 plan or individual retirement account from prior years are taken into account in computing the excess contribution for a given subsequent year for purposes of the excise tax thereon. In formulating a contribution limitation for corporate plans, however, Congress imposed a year-by-year limitation in section 415 and chose not to deal with the problem of unwarranted tax deferrals on excess contributions by means of that section.

Third, the majority assumes that continuing disqualification under section 415 is the only method Congress intended to address the hypothetical abuse. This assumption is not correct in view of the various excise taxes promulgated by Congress to address the problem of overfunding. Secs. 4972, 4980, 4981A, and 72(m)(5). Moreover, the hypothetical abuse identified by the majority, brought about by intentional overfunding of a plan, might be remedied by respondent's invocation of his authority

under section 482 or section 269A to reallocate tax benefits between or among controlled entities.

*Conclusion*

The unambiguous statute and a dispositive legislative regulation require limitation of disqualification under section 415 to the year in which an excess annual addition occurs. In arriving at its contrary conclusion, the majority in effect rewrites the statute. That task is best left to the Congress, not this Court. Justice Frankfurter admonished against the danger of attempting to rewrite an otherwise clear statute to conform to perceived policy considerations:

And so we have one of those problems in the reading of a statute wherein meaning is sought to be derived not from specific language but by fashioning a mosaic of significance out of the innuendos of disjointed bits of a statute. At best this is subtle business, calling for great wariness lest what professes to be mere rendering becomes creation and attempted interpretation of legislation becomes legislation itself. [*Palmer v. Massachusetts,* 308 U.S. 79, 83 (1939).]

CHABOT, KÖRNER, SWIFT, WRIGHT, and WILLIAMS, *JJ.,* agree with this dissent.